**BROADCAST MUSIC, INC.,
Plaintiff-Appellee,**

v.

**XANTHAS, INC., d/b/a TAC Amusement Co., Defendant–Appellant.**

**No. 87–3831.**

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1988.

Vallerie Oxner, New Orleans, La., for defendant-appellant.

Earl S. Eichin, Jr., O'Neil, Eichen & Miller, New Orleans, La., Jonathan Zavin, Marya Lenn Yee, Zavin, Sinnreich & Was-

serman, New York City, for plaintiff-appellee.

Before WISDOM, GEE, and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

In this copyright-infringement suit, a jukebox operator found guilty of willful infringement of music performance rights challenges the district court's findings of willfulness and the number of infringements and the court's calculation of damages. We hold that the court did not err in finding the infringements willful, but that some of the evidence proving that the defendant owned jukeboxes on which infringements took place was inadmissible hearsay and, therefore, findings of infringement based solely on this evidence cannot stand. We therefore affirm in part, reverse in part, and remand for the court to determine how many infringements were proved by the remaining, admissible evidence.

## I.

The plaintiff, Broadcast Music, Inc. ("BMI"), is a nonprofit licensing organization that obtains public-performance rights in copyrighted musical compositions and collects royalties to be distributed to the artists. The defendant, Xanthas, Inc., which does business in Louisiana as TAC Amusement Co., owns and operates hundreds of jukeboxes, video games, pinball machines, and billiard tables that it places in various establishments.

BMI sued Xanthas and its owner, John J. Elms, Jr., in federal district court, alleging that Xanthas had committed fifteen acts of copyright infringement at four locations in July and August 1986. The complaint alleged that Xanthas had failed to pay the required fee to the U.S. Copyright Office for licenses to operate its jukeboxes and had then played on them compositions in which BMI held the performance rights.

BMI later amended its complaint to allege 182 infringements at 22 different locations between May and November 1986. The amended complaint sought an injunction against further infringements and damages of at least $250 for each infringement claimed.

The action was stayed against Elms, who had declared bankruptcy. Xanthas stipulated that it owned seven of the jukeboxes and had committed 44 of the infringements, but it contended that it did not know whether it owned the remaining jukeboxes on which the infringements allegedly took place.

After a bench trial, the district court entered judgment for BMI. 674 F.Supp. 553. In its findings of fact, the court stated that each of the 182 infringements alleged had occurred on the dates and in the locations alleged and that on each date, Xanthas had owned and operated the jukebox on which the songs were played without having paid the copyright office the required registration fee. The court found that Xanthas knew of the registration requirement, having paid registration fees between 1978 and 1981 and having been apprised of its delinquency by BMI, but had "willfully neglected" to pay registration fees from 1984 through 1986.

Because BMI had elected, as was its right, to take the "statutory damages" authorized by § 504(c) of the Copyright Act,[1] the district court concluded that BMI could recover between $250 and $50,000 for each infringement. The court then stated that the "proper" measure of damages was three times the amount of Xanthas's unpaid registration fees. In calculating the number of jukeboxes Xanthas owned, and thereby its delinquent fees, the court found that Xanthas had owned 586 jukeboxes in 1984, that it had owned 584 jukeboxes through 1987 but had proved only 27 of these to have been registered in that year, and finally that "rounding off the number of jukeboxes that defendant Xanthas owned in 1984–87 to 500 per year is in the best interest of justice." The court there-

---

1. 17 U.S.C. § 504(c).

fore awarded $319,500 in statutory damages, calculated as follows:

| Year | No. of jukeboxes | Fee | Amount | Amount tripled |
|------|------------------|-----|--------|----------------|
| 1984 | 500 | $50 | $25,000 | $ 75,000 |
| 1985 | 500 | 50 | 25,000 | 75,000 |
| 1986 | 500 | 50 | 25,000 | 75,000 |
| 1987 | 500 | 63 | 31,500 | 94,500 |
| | | | | $319,500 |

Xanthas appeals, challenging the court's finding of willfulness, the evidence by which the infringements and Xanthas's jukebox ownership were proved, and the court's method of calculating damages.

## II.

■ Under the Copyright Act of 1976, a jukebox operator who wishes to play copyrighted music must, unless he has specific permission from the copyright owner, register his jukeboxes with the United States Copyright Office and pay an annual registration fee to the Copyright Office, which then forwards the fees to the principal performance-rights societies such as BMI.[2] The society then distributes the money pro rata to those of its members who created or owned the music. A jukebox operator who fails to register his jukeboxes and then performs copyrighted music infringes the copyright and is subject to penalties provided by the Copyright Act.[3]

Under 17 U.S.C. § 504(c), a copyright owner who has proved an infringement may elect before final judgment, as BMI did here, to receive "statutory damages" instead of his actual damages or the infringer's profits. Statutory damages may range from $250 to $10,000, "as the court considers just," "for all infringements involved in the action, with respect to any one work."[4] If the court finds the infringement was committed willfully, the court "in its discretion" may increase the statutory award to no more than $50,000.[5]

As this language makes clear, BMI's and the district court's focus on the number of infringements in the calculation of damages was misplaced. The House committee report on the statutory-damages provision states pellucidly: "A single infringer of a single work is liable for a single amount between $250 and $10,000, no matter how many acts of infringement are involved in the action.... Where the suit involves infringement of more than one separate and independent work, minimum statutory damages for each work must be awarded."[6]

Even on appeal, however, Xanthas has not challenged the district court's failure to enter a finding concerning the number of "separate and independent" works infringed. We will not, therefore, reverse the district court on this basis but will permit the entry of a damage award premised, even if incorrectly, on the number of infringements.

## III.

■ There is no merit in Xanthas's claim that its infringement was not willful. Xanthas admits that it knew of the registration requirements and made a conscious decision to violate them; it argues only that its violation was not "deliberate" because it could not afford to pay the fees. A defendant acts "willfully" within the meaning of § 504(c)(2), however, if he knows his actions constitute an infringement; the actions need not have been malicious.[7] Faced with a financial inability to pay the fees required by law, Xanthas could have approached BMI and sought permission, temporary or otherwise, to play copyrighted songs. Instead, it chose to stay in business and use BMI's music without paying for it. That was patently willful.

## IV.

Xanthas next argues that some of the evidence used to prove its ownership of

---

**2.** 17 U.S.C. § 116(b), (e)(3).

**3.** *Id.* § 116(b)(2).

**4.** 17 U.S.C. § 504(c)(1).

**5.** *Id.* § 504(c)(2).

**6.** House Comm. on the Judiciary, H.R.Rep. No. 94–1476.

**7.** *Fitzgerald Pub. Co. v. Baylor Pub. Co.,* 807 F.2d 1110, 1115 (2d Cir.1986), *relying on* Melville Nimmer, 3 Nimmer on Copyright § 14.04[B][3] at 14–30.6–30.7 (1986).

jukeboxes on which infringements allegedly took place was inadmissible hearsay and therefore the district court's finding concerning the number of infringements cannot stand.

BMI first argues, concerning this as well as other claims of error, that any mistake the district court committed is harmless because the damage award the court entered fell within the wide range permitted by § 504(c)(1) and (2). Under this section, while the district court is bound by the rule that it must award damages according to the number of "separate and independent" works infringed, the court enjoys wide discretion in setting the amount of damages for each work infringed and hence the final amount of damages. Section 504(c) authorizes the court to award an amount from $250 to $10,000 for each work infringed "as the court considers just," and to increase the per-work-infringed award to $50,000, "in its discretion," for willful infringements.

The statute by its terms places no further limits on the district court's discretion. Indeed, in *Douglas v. Cunningham*,[8] the leading case on the standard of review of statutory-damage awards, the Supreme Court stated: "[T]he employment of the statutory yardstick, within set limits, is committed solely to the court which hears the case, and this fact takes the matter out of the ordinary rule with respect to abuse of discretion." The Court therefore reversed the court of appeals' restriction of the district court's damage award of $1 per copy.

Even considering only the 44 infringements to which Xanthas stipulated, therefore, the district court had discretion to award anything from $11,000 (44 × $250) to $2,200,000 (44 × $50,000) in statutory damages. If BMI proved all of the infringements it alleged, the maximum award permitted would be $91,000,000 (182 × $50,000). The district court's award of $319,500 obviously falls well below the maximum, however computed.

Section 504(c), however, does not give the district court discretion to premise its award on a number of infringements not proved by admissible evidence. As we stated in our only reported decision on the statutory-damages provision, damages may not be awarded "without a hearing or a demonstration by detailed affidavits establishing the necessary facts."[9] That the district court enjoys such wide discretion in fixing the amount of damages for each work infringed makes it all the more important that we review its premise as to the number of works infringed (in this case, the number of infringements). Because, moreover, the court's decision is so discretionary, we cannot tell how it would have ruled had it premised its decision on a different number of infringements.[10]

We therefore see no merit in BMI's argument that any error in determining the number of infringements is harmless because the eventual award was within the permissible range. For the same reason, we are not persuaded any error was harmless because the court eventually calculated damages according to unpaid registration fees rather than infringements. The court might have used a different measure had it found a different number of infringements.

Xanthas argues that 138 of the 182 infringements, those to which it had not stipulated, were proved by inadmissible hearsay evidence. Much of the evidence proving these infringements came in the form of testimony from Scott Martin, a BMI attorney in charge of monitoring jukebox owners' compliance with the registration requirements. Martin read the responses of proprietors of establishments with jukeboxes to questionnaires that BMI had sent asking who owned the jukebox in their establishment. The proprietors themselves did not testify.

---

8. 294 U.S. 207, 210, 55 S.Ct. 365, 366, 79 L.Ed. 862 (1935); *see also Morley Music Co. v. Dick Stacey's Plaza Motel, Inc.*, 725 F.2d 1, 3 (1st Cir.1983).

9. *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir.1979); *see also Morley Music Co.*, 725 F.2d at 3.

10. *See Fitzgerald Pub. Co.*, 807 F.2d at 1116.

■ BMI argues that Xanthas is estopped to deny its ownership and operation of the fifteen jukeboxes in dispute because Xanthas failed to produce documents that BMI had requested regarding its ownership of its jukeboxes. BMI, however, never moved under Federal Rule of Civil Procedure 37 to compel the production of this evidence. Sanctions such as estoppel may be imposed under Rule 37(b) for failure to produce documents only when the court has entered an order compelling discovery.[11] The pretrial order stated that "immediate receipt of such documents would expedite plaintiff's preparation of this case for trial or preparation of a motion for summary judgment." Although Xanthas had not produced the documents by the time of trial, BMI never sought, and the district court never entered, sanctions for this failure. Apparently neither the parties nor the court, therefore, viewed the statement in the pretrial order as an order compelling discovery sufficient to notify Xanthas of a duty to produce the documents, and a violation of which would expose it to sanctions such as estoppel.

■ The district court erred when it admitted this evidence on the ground that hearsay is admissible in a bench trial; it is not. Under Federal Rule of Evidence 802, "[h]earsay is not admissible except as provided by [the Federal] [R]ules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress," and neither this rule nor any other rule or statute creates an exception for bench trials. Moreover, the trial court relied on this evidence, so if its admission was error, it was not harmless.[12]

■ The letters from proprietors, moreover, do not fall within the exception making business records admissible. That exception, embodied in Federal Rule of Evidence 803(6), in relevant part permits the admission of a record

> made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... record, ... all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

BMI argues that it drafted and mailed the questionnaires as part of its "regularly conducted business activity." The information presented as evidence, however, came not from BMI but from proprietors of establishments with jukeboxes. Nothing in the record shows that the proprietors completed these forms in the course of their regular business activities. Even assuming the proprietors had filled out such forms regularly, this would not show that they were kept "in the regular course of business" under Rule 803(6), as the Supreme Court held in *Palmer v. Hoffman*,[13] construing the statutory predecessor of Rule 803(6). Like the accident reports the railroad in *Palmer* customarily produced, the forms were not completed by the proprietors as part of the "systematic course" of their business; their primary utility, rather, is for litigation.[14]

■ BMI argues alternatively that the letters from proprietors are reliable, and therefore admissible, because they were sent and completed pursuant to a procedure authorized by § 116(a)(1)(B) of the Copyright Act.[15] We have on occasion ac-

---

**11.** *See also Cates v. LTV Aerospace Corporation,* 480 F.2d 620, 624 (5th Cir.1973).

**12.** *Moore v. United States,* 429 U.S. 20, 97 S.Ct. 29, 30, 50 L.Ed.2d 25 (1976) (per curiam).

**13.** 318 U.S. 109, 111–15, 63 S.Ct. 477, 479–81, 87 L.Ed. 645 (1943).

**14.** *Id.* at 114, 63 S.Ct. at 481.

**15.** 17 U.S.C. § 116(a)(1)(B), which provides in relevant part:

> The proprietor of the establishment in which the public performance takes place is not liable for infringement with respect to such public performance unless ... such proprietor refuses or fails, within one month after receipt by registered or certified mail of a request, ... by the copyright owner, to make full disclosure, by registered or certified mail, of the identity of the operator of the phonorecord player.

cepted arguments of this form, whether under the business-records exception or under the "catch-all" exception of Rule 803(24), which permits the admission of evidence when circumstances indicate it is trustworthy and more probative than other available evidence.[16] The provision in the Copyright Act, however, contains no assurances of the reliability of the statements by proprietors. It imposes penalties on proprietors for failing to return the forms, but not for providing inaccurate information on them. Although the proprietors doubtless had incentives to keep accurate records of who owned the jukeboxes in their establishments, we do not see how they had any incentive to fill out the questionnaires from BMI with precision or completeness.[17]

■ BMI, however, introduced independent, non-hearsay evidence of Xanthas's ownership of each of the 22 jukeboxes in dispute. The Appendix summarizes the evidence. Xanthas stipulated that it owned seven of the jukeboxes. Ten appeared on a list that Xanthas had filed in 1984 detailing its assets that might serve as collateral for a bank loan; this list is not hearsay but a party admission properly received as evidence.[18] Finally, Gary Meliet, the president of a company engaged in a joint venture with Xanthas, testified that in early January 1987, his company took over the operation of ten of Xanthas's jukeboxes that BMI had alleged were used for infringements, including five that Xanthas had in 1984 listed itself as owning.

■ The relevant issue, however, was Xanthas's ownership of jukeboxes in 1986 when the infringements were alleged to have taken place. That Xanthas listed a jukebox on the collateral list in 1984 is insufficient by itself to prove that Xanthas owned or operated the jukebox in 1986. According to unrefuted testimony, the proprietors of establishments in which jukeboxes are operated change suppliers frequently when the proprietors seek new styles of music. Moreover, between 1984 and 1986, Xanthas went into bankruptcy and its stock of jukeboxes declined, although to what extent is not clear. As to five jukeboxes, representing forty infringements, the only evidence of Xanthas's ownership came from the collateral list. We therefore reverse the district court's conclusion that these forty infringements were proven.

With respect to the ten jukeboxes for which independent testimony of ownership came from Gary Meliet, however, we will remand for the district court to consider whether the admissible evidence was sufficient to prove Xanthas's ownership. Meliet testified that his company took over these ten jukeboxes, among others, from Xanthas at the beginning of 1987, only a few months after the infringements allegedly took place. Because ownership changed hands frequently, however, Meliet admitted it would be "speculation" to conclude that Xanthas had owned these boxes earlier in 1986.

The district court should have the first opportunity to address this close question of fact based on the remaining, admissible evidence. We would remand in any event, moreover, because, as noted above, we cannot tell how the district court would have exercised its wide discretion in awarding statutory damages had it concluded, as we have, that forty of the alleged infringements were not proved by admissible evidence.

We note, for the benefit of the district court on remand, that of the ten jukeboxes (representing 98 infringements) that Meliet testified belonged to Xanthas in early 1987, five (representing 54 infringements) also appear on the collateral list indicating that Xanthas owned them in 1984. The district court may find the inference stronger that

---

16. See United States v. Veytia-Bravo, 603 F.2d 1187, 1189–91 (5th Cir.1979); United States v. Ragano, 520 F.2d 1191 (5th Cir.1975), cert. denied, 427 U.S. 905, 96 S.Ct. 3192, 49 L.Ed.2d 1199 (1976); United States v. Snell, 508 F.2d 21 (5th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 41 (1975).

17. Cf. Veytia-Bravo, 603 F.2d at 1191; Ragano, 520 F.2d at 1200–01.

18. Fed. R. Evid. 801(d)(2).

## 240

Xanthas owned these jukeboxes in 1986 than that it owned the jukeboxes for which the only identification came from Meliet.

We conclude, in sum, that (1) BMI proved infringements on seven jukeboxes, representing 44 infringements, that Xanthas admitted owning; (2) the findings of forty other infringements, on five jukeboxes, were supported solely by inadmissible hearsay evidence and must be overturned; and (3) the district court should reconsider the sufficiency of proof of the remaining 98 alleged infringements (on ten jukeboxes) now that we have ruled the letters from proprietors inadmissible.

We need not now consider Xanthas's other claims on appeal, some of which raise difficult questions concerning the discretion of the district court to award damages based on Xanthas's failure to pay license fees in years for which BMI neither alleged nor proved infringements. These issues may not arise should the district court choose a different measure of damages on remand.

For these reasons, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

### APPENDIX

**Stipulated to by Xanthas:**

| Location of jukeboxes | Number of infringements |
|---|---|
| 1. Godfather's Pizza, 6601 Veterans Blvd., Metairie | 5 |
| 2. Johnny's Pizza, 14030 Plank Rd., Baker | 6 |
| 3. Steak & Egg Kitchen, 2239 Williams Blvd., Kenner | 5 |
| 4. Sal's Lounge, 5032 W. Esplanae, Metairie | 10 |
| 5. Steak & Egg Kitchen, 3647 Veterans Blvd., Metairie | 4 |
| 6. Steak & Egg Kitchen, 7733 Florida Blvd., Baton Rouge | 8 |
| 7. Godfather's Pizza, 3600 Williams Blvd., Kenner | 6 |
| | 44 |

**Proved only by 1984 collateral list:**

| Location of jukeboxes | Number of infringements |
|---|---|
| 1. Mia Chere's, 16467 Florida Blvd., Baton Rouge | 11 |
| 2. Luc Eddie's, 2725 Mississippi Ave., Metairie | 4 |
| 3. Rack-It Bar, 11463 Plank Rd., Baker | 13 |
| 4. Bungalow Lounge, 5908 Airline Hwy., Baton Rouge | 6 |
| 5. Le Meledy, 3124 Loyola Dr., Kenner | 6 |
| | 40 |

**Provided only by Gary Meliet's testimony:**

| Location of jukeboxes | Number of infringements |
|---|---|
| 1. Johnny's Pizza, 14265 Old Hammond, Baton Rouge | 12 |
| 2. Johnny's Pizza, 3404 Drusilla Ln., Baton Rouge | 5 |
| 3. Jody's, 5680 Plank Rd., Baton Rouge | 9 |
| 4. Patio Lounge, 8743 Jefferson Hwy., Baton Rouge | 11 |
| 5. Johnny's Pizza, 12451 Jefferson Hwy., Baton Rouge | 7 |
| | 44 |

**Proved by both Meliet and 1984 list:**

| Location of jukeboxes | Number of infringements |
|---|---|
| 1. Florida Jnctn., 13431 Florida Blvd., Baton Rouge | 8 |
| 2. Pizza Inn, 5580 Government St., Baton Rouge | 7 |
| 3. Europe's Pizza, 6764 Airline Hwy., Baton Rouge | 11 |
| 4. Pastime Lounge, 252 South Blvd., Baton Rouge | 10 |
| 5. CheckMate Lounge, 8384 Airline Hwy., Baton Rouge | 18 |
| | 54 |